# In the United States Court of Federal Claims

No. 14-703C

(Filed: May 26, 2015)

```
*********************************** *
                                    *
AUREUS ASSET MANAGERS, LTD., et.    *
al.,                                *
                                    *  Fifth Amendment Taking Claim;
            Plaintiffs,             *  1985 Terrorist Hijacking Sponsored
                                    *  by Government of Libya; Effect of
v.                                  *  U.S. Claims Settlement Agreement
                                    *  With Libya; Rule 12(b)(6) Motion to
THE UNITED STATES,                  *  Dismiss.
                                    *
            Defendant.              *
                                    *
*********************************** *
```

*Steven R. Perles, Edward B. MacAllister*, and *Joshua K. Perles*, Perles Law Firm, PC, Washington, D.C., for Plaintiffs.

*L. Misha Preheim,* with whom were *Joyce R. Branda,* Acting Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, and *Reginald T. Blades, Jr.,* Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## OPINION AND ORDER ON
## DEFENDANT'S MOTION TO DISMISS

WHEELER, Judge.

Plaintiffs Aureus Asset Managers, Ltd. ("Aureus") and Riverstone Insurance (UK), Ltd. ("Riverstone") are corporations organized under the laws of the United Kingdom. Aureus is an asset management entity and Riverstone is an insurance provider. Aureus is the successor in interest to Minster Insurance Group, Ltd. ("Minster"), which Aureus acquired in a December 22, 2010 voluntary liquidation. Minster and Riverstone were among the entities who provided liability insurance coverage for the aircraft hull of EgyptAir Flight 648 on November 23, 1985. This flight fell victim to a terrorist attack later determined to have been sponsored by the government of Libya. When the United States lifted Libya's sovereign immunity in 1996 for its state sponsorship of terrorism,

Plaintiffs brought civil claims in the United States District Court for the District of Columbia for indemnification of the losses sustained in insuring the destroyed aircraft. The United States later restored Libya's sovereign immunity in 2008, thereby terminating all pending claims against Libya, and directing the claims of U.S. nationals to be heard by the Foreign Claims Settlement Commission ("FCSC"), an independent agency within the Department of Justice. The FCSC's jurisdiction excluded Plaintiffs because they are not U.S. nationals. Plaintiffs now bring this action for the Government's alleged taking of their legal claims without just compensation in violation of the Fifth Amendment. The case is before the Court on Defendant's motion to dismiss for failure to state a claim upon which relief can be granted.

<u>Factual Background</u>

EgyptAir Flight 648 was a Boeing 737-200 passenger airplane scheduled to travel on November 23, 1985 from Athens, Greece to Cairo, Egypt with 89 passengers (excluding hijackers) and six crew members. <u>See</u> Compl. ¶ 11. Abu Nidal Organization ("ANO"), also referred to as Black September, was a known terrorist organization in Libya. <u>Id.</u> ¶ 12. Ten days earlier, an ANO terrorist named Omar Rezaq and two other ANO terrorists traveled from Beirut to Athens with illegal passports and boarded EgyptAir Flight 648 on the day of the flight. <u>Id.</u> ¶ 17. Twenty-two minutes into the flight, the ANO terrorists hijacked the plane, and caused a mid-flight shootout with an Egyptian Sky Marshal. <u>Id.</u> ¶ 18. The shootout pierced the fuselage and caused severe depressurization, forcing the plane to land in Malta. <u>Id.</u> The terrorists demanded refueling, but the Maltese government refused. <u>Id.</u> ¶ 19. The terrorists proceeded to assassinate passengers systematically, beginning with two Israeli women, followed by three Americans. <u>Id.</u> ¶ 20. Then, 24 hours after the hijacking began, Egyptian commandos stormed the plane in an effort to rescue the remaining passengers. <u>Id.</u> ¶ 21. Using explosives, the commandos breached the plane doors. <u>Id.</u> In response to the raid, the terrorists lobbed hand grenades into the passenger cabin, killing dozens. <u>Id.</u> ¶ 22. In addition to the human tragedy and loss of life, the aircraft hull was damaged beyond repair. <u>Id.</u> ¶ 23.

Subsequent to the attack, the United States Department of Defense determined that ANO had conducted the hijacking with the sponsorship of the Libyan government, which provided material support for ANO and its terrorist members. <u>Id.</u> ¶ 13. Libya and Syria provided safe haven, training, logistic assistance, and financial aid to ANO. <u>Id.</u> ¶ 15. Libya provided its support in the form of weapons, money, airline tickets, unobstructed travel and haven in Libya, terrorism training, protected transport of weapons in Libya's "diplomatic pouch" in freight transit, official documents and Tunisian passports, as well as operational assistance in preparing for the hijacking of EgyptAir Flight 648. <u>Id.</u> ¶ 16. Defendant does not contest that Libya provided material support for the hijacking of Flight 648. The destroyed aircraft was insured for $14 million. <u>Id.</u> ¶ 24.

This case turns heavily on the existence of Libya's sovereign immunity from suit. In 1996, amendments to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, lifted Libya's sovereign immunity for its state sponsorship of terrorism.  Id. ¶ 25. On April 26, 2006, Plaintiffs filed suit in the U.S. District Court for the District of Columbia against Libya and Syria to recover payments made for the insurance of EgyptAir Flight 648.  Certain Underwriters at Lloyd's London v. Socialist People's Libyan Arab Jamahiriya, No. Civ. 06-731(GK) (D.D.C. filed April 21, 2006).  On August 4, 2008, Congress enacted the Libyan Claims Resolution Act, Pub. L. No. 110-301, 122 Stat. 2999 (2008) ("LCRA") which stripped the U.S. District Court of its subject matter jurisdiction over Plaintiffs' claims against Libya.  Compl. ¶ 27.  On August 14, 2008, the United States entered into a Claims Settlement Agreement with Libya, terminating all pending suits against Libya for death or property loss caused by an act of "extra judicial killing, aircraft sabotage . . . or the provision of material support or resources for such an act."  Id. ¶ 28; Claims Settlement Agreement Between the United States of America and the Great Socialist People's Libyan Arab Jamahiriya, 2008 U.S.T. Lexis 72, entered into force Aug. 14, 2008.  President George W. Bush issued Executive Order No. 13477 on October 31, 2008, terminating all current and pending terrorism-related claims against Libya pursuant to the LCRA.  The Order espoused the claims of all U.S. Nationals and established a procedure to compensate those U.S. nationals.  The Order did not provide for compensation of foreign nationals.  As a result, in 2010, the United States obtained a dismissal of Plaintiffs' suit against Libya for the hijacking of EgyptAir Flight 648, citing the public purpose of "normalizing" relations with Libya.  Compl. ¶ 32.

Under the terms of the LCRA and Executive Order No. 13477, the Department of State referred the claims of U.S. nationals against Libya to the FCSC in December 2008 and January 2009.  The FCSC imposed a "continuous nationality rule" in its jurisdiction, requiring that all claimants be United States nationals from the time of the wrongful international act until the espousal of the claim by the United States Government.  Id. ¶ 35. Accordingly, the Plaintiffs did not submit a claim for the EgyptAir losses.  Id. ¶ 36.  Only New York Marine, the sole United States corporation involved in the action, filed a claim with the FCSC to recover losses from the EgyptAir flight.  Id.  The FCSC rejected this claim for lack of jurisdiction as well, finding that EgyptAir itself was the proper party to bring the claim because EgyptAir owned the aircraft hull.  Id. ¶ 37.

Plaintiffs filed the present action on August 4, 2014, alleging a taking without just compensation in violation of the Fifth Amendment of the United States Constitution.  Id. ¶ 1.  Plaintiffs allege damages of $1,208,964.24 in performance of their insurance obligations resulting from the destruction of EgyptAir Flight 648.  Id. ¶ 3.  On November 13, 2014, Defendant filed a motion to dismiss under Rule 12(b)(6) for Plaintiffs' failure to state a claim upon which relief can be granted.  Defendant does not contest the facts surrounding

the destruction of the aircraft or Libya's sponsorship of the terrorist acts.   However, Defendant argues that Plaintiffs have not identified a cognizable property interest upon which to base their takings claims, and that the United States did not "take" their property if it is considered a property interest.   In the alternative, Defendant argues that the Court should dismiss this suit as a non-justiciable political question.

In opposition to Defendant's motion, Plaintiffs filed a response on January 22, 2015, arguing that they have a legally cognizable property interest in their judicial claims against Libya.   Plaintiffs further argue that the Government's extinguishment of those claims without providing an alternative means of recovery was a taking under the Fifth Amendment.   Plaintiffs also dispute that this case involves a non-justiciable question.   The motion has been fully briefed, and the Court heard oral argument on May 4, 2015.   The motion is ready for decision.

Discussion

A.   Jurisdiction

The Tucker Act provides this Court with exclusive jurisdiction for "any claims against the United States founded . . . upon the Constitution" in excess of $10,000.   28 U.S.C. § 1491(a)(1); 28 U.S.C. § 1346(a)(2).   "This [provision] includes on its face all takings claims against the United States."   Lion Raisins, Inc. v. United States, 416 F.3d 1356 (Fed. Cir. 2005); Acceptance Ins. Cos. Inc. v. United States, 503 F.3d 1328 (Fed. Cir. 2007) ("A Fifth Amendment takings claim falls within the Tucker Act's grant of jurisdiction because it is a 'claim against the United States founded upon the Constitution.'").   The Tucker Act itself does not create a substantive cause of action.   In order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.   Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005).   In the parlance of Tucker Act cases, that source of law must be "money-mandating."   See United States v. Helen Mitchell, 463 U.S. 206, 217 (1983).   It is well-established that the Takings Clause of the Fifth Amendment is a money-mandating source of law for purposes of Tucker Act jurisdiction.   See Jan's Helicopter Serv., Inc. v. F.A.A., 525 F.3d 1299, 1309 (Fed. Cir. 2008).   As Plaintiffs here allege the taking of their property without just compensation, the Court has jurisdiction of their claim.

The Fifth Amendment applies with equal effect to foreign nationals whose property is taken by the Government without just compensation.   Russian Volunteer Fleet v. United States, 282 U.S. 481 (1931); Alvarez-Mendez v. Stock, 746 F. Supp. 1006, 1015 (C.D. Cal. 1990) ("[N]on-resident aliens are entitled to the protection of the Fifth Amendment's prohibition on unlawful takings").

4

B.  Standard of Review

In reviewing a Rule 12(b)(6) motion to dismiss, the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in favor of the non-moving party.  Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000) (internal citation omitted).  To survive a Rule 12(b)(6) motion to dismiss, a plaintiff needs to provide only "'a short and plain statement of the claim,'" showing a plausible claim to relief.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

C.  Stating a Taking Claim

In evaluating whether government action constitutes a Fifth Amendment taking, courts generally conduct a two-part analysis.  "First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether that property interest was 'taken.'" Acceptance Insurance Cos., Inc. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009).  In order to prevail on the Government's motion to dismiss, Plaintiffs must only plead sufficient facts that, when accepted as true, show that Plaintiffs had a cognizable property interest in their claims against Libya, and that the Government took the claims by Executive Order and the FCSC's jurisdictional limitations.  As explained below, the Court finds that Plaintiffs have met their burden to survive the Government's Rule 12(b)(6) motion to dismiss.

1.  Cognizable Property Interest

The Constitution "neither creates nor defines the scope of property interests compensable under the Fifth Amendment." Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (citing Bd. Of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).  Instead, courts look to "'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law" to define the requisite property interest to establish a taking.  Id. (citing Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1030 (1992)).  This broad standard for identifying Fifth Amendment property interests has been held to include intangible rights, such as leaseholds, United States v. General Motors Corp., 323 U.S. 373, 378 (1945), liens, Armstrong v. United States, 364 U.S. 40, 44 (1960), and contracts, Lynch v. United States, 292 U.S. 571, 579 (1934).

In support of a finding that Plaintiffs' causes of action against Libya constitute property interests for the purpose of establishing a taking claim, Plaintiffs cite three primary cases, two of which are controlling precedent from the Federal Circuit. First, in Alliance of Descendants of Texas Land Grants v. United States, 37 F.3d 1478 (Fed. Cir. 1994), the plaintiffs sued the United States under the Fifth Amendment for extinguishing their unresolved claims against the government of Mexico. The United States had previously entered into a treaty with Mexico, removing jurisdiction of all United States tribunals over the plaintiffs' claims for compensation from Mexico for land grant disputes. Though the plaintiffs ultimately lost the case based upon the statute of limitations, the Federal Circuit first found that the plaintiffs had identified a property interest in their causes of action. The Government is quick to dismiss this precedent "because it involved land," and a right to sue for compensation relating to land is "an incident of ownership of the land itself." Def.'s Reply at 8. Thus, the Government argues, that case was more analogous to a suit for a taking of land than it is to the judicial claims at issue here.

The Court declines to ignore Alliance of Descendants as quickly as the Government. The Federal Circuit undertook a short yet complete analysis of the underlying taking claim at issue in that case, "examin[ing] what private property the United States allegedly took." Alliance of Descendants, 37 F.3d at 1481. The court found that plaintiffs had alleged a taking of "their *property interest in a legal cause of action*." Id. (emphasis added). Indeed, the Federal Circuit pointed out that "[t]he claimants do not in this suit allege a taking of the land in Texas itself. Rather, they allege that the United States took away their legal right to sue for compensation for that land." Id. Then, in unqualified language, the court stated, "[b]ecause a legal cause of action is property within the meaning of the Fifth Amendment . . . claimants have properly alleged a compensable property interest." Id. (citing Cities Servs. Co. v. McGrath, 342 U.S. 330, 335-36 (1952) and Ware v. Hylton, 3 U.S. 199, 245 (1796)). Nowhere does the Federal Circuit limit its reasoning to the incidence of land ownership. Indeed, neither Cities Services nor Ware involve takings of land. See Cities Servs. Co, 342 U.S. at 331 (involving gold debentures); Ware, 3 U.S. at 245 (involving rights of debtors injured by public treaty). Thus, Defendant's dismissal of Alliance of Descendants because it involves land is unavailing, and the Court instead finds the case to be controlling.

The second major case upon which Plaintiffs rely is Abrahim-Youri v. United States, 139 F.3d 1462 (Fed. Cir. 1997). In that case, former hostages in Iran sued the Government under a taking theory for espousing and settling their claims against Iran for damages suffered during their capture. Id. at 1463. The United States signed the Algiers Accords and settled with Iran in return for the freeing of the hostages and setting up a tribunal to hear claims. Id. at 1464. The plaintiffs in that case were awarded damages with interest by the FCSC, but the money in the settlement fund was insufficient to cover all of the interest. Id. As a result, the plaintiffs were forced to accept full compensation but only

34.5 percent of their awarded interest.  Id.  They sued under a taking theory for the uncompensated remainder.

Once again, the Federal Circuit stated, "[w]e agree with plaintiffs that their property rights – their choses in action against Iran – were extinguished when the Government espoused and settled their claims."  Id. at 1465.  Ultimately, the Court found no compensable taking for other reasons.  However, for purposes of determining a cognizable property interest, the Federal Circuit maintained its earlier position from Alliance of Descendants that causes of action against a foreign sovereign are property interests under the Fifth Amendment.  Yet the Government dismisses this case, asserting that the Federal Circuit did not "specifically address whether the referenced 'choses in action' constituted property within the meaning of the Takings Clause," and it is unclear if the Federal Circuit was merely agreeing that "what the plaintiffs had identified as property rights were extinguished."  Def.'s Reply at 8-9.  The Court disagrees.

In Abrahim-Youri, the Federal Circuit compared the claims at issue with those in Belk v. United States, 858 F.2d 706 (Fed. Cir. 1988), another takings case involving U.S. hostages in Iran.  The Federal Circuit described the legal theory in Belk as similar to that in Abrahim-Youri, noting that in Belk, "[t]he former hostages alleged that the Government took their property – their causes of action against Iran – by entering into the Algiers accords with Iran."  Abrahim-Youri, 139 F.3d at 1466.  This overt recognition of similar legal claims undermines the Government's assertion here that the Federal Circuit gave cursory consideration to whether causes of action are property.  Instead, the Federal Circuit distinguished Belk from Abrahim-Youri on different grounds, finding that the former hostages in Belk were the intended beneficiaries of the Algiers Accords, and thus the plaintiffs failed to show the taking was performed for the public good alone.  Furthermore, the Government, as the defendant in Belk, "assumed the alleged causes of action against Iran constitute property" for the purposes of the motion for summary judgment.  Belk v. United States, 12 Cl. Ct. 732, 733 (1987).

Third, Plaintiffs rely on Shanghai Power v. United States, 4 Cl. Ct. 237 (1983), aff'd, 765 F.2d 159 (Fed. Cir. 1985), to argue that even *unfiled* causes of action can be considered property under the Fifth Amendment.  Pl.'s Opp. at 9.  In Shanghai Power, the Court found a property interest in claims against China for expropriation that were later settled by President Carter for less than full value.  4 Cl. Ct. at 239.  The Court construed the concept of Fifth Amendment property broadly, finding that any interest will be considered "property for purposes of the [F]ifth [A]mendment unless that interest is devoid of a legally enforceable right or recognition of a property interest would contravene public policy."  Id. at 240.  The Court held that a claim for compensation based on expropriation met this standard.  Id.  The Court did not disqualify the claims as property for being nascent. Instead, the Court found the stage of the claim relevant only to its value, considering factors like forum availability and likelihood of success to determine damages.  Id. at 241-42.

The Government does not address how Shanghai Power might work against the Plaintiffs' property interest argument here.  Instead, the Government merely asserts that the Court found no taking due to the lack of a reasonable expectation of recovery in claims involving foreign relations, and the inherent authority of the President to espouse claims.  Gov.'s Reply at 9.  The Government also points to the holding that the case was non-justiciable as it interfered with the President's ability to carry on diplomatic relations.  Id.  Thus, the Government does not explain how the finding of a property interest in Shanghai Power is inapplicable to the facts here.  Accordingly, the Court finds Shanghai Power instructive.

In its motion, Defendant relies upon three main cases to argue against the existence of a Fifth Amendment property interest in this case.  First, the Government cites Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004) for the proposition that "causes of action (particularly ones sounding in tort) do not constitute cognizable or 'vested' property."  Def.'s Mot. to Dismiss at 5-6; Adams, 391 F.3d at 1225-26.  In Adams, the plaintiffs sued under a taking theory for the extinguishment of four years of Fair Labor Standards Act ("FLSA") claims after Congress shortened the statute of limitations from six years to two years.  391 F.3d at 1219.  However, the Federal Circuit did not hold that causes of action are *never* "vested" property rights under the Fifth Amendment.  Instead, the appellate court held that property rights from legal claims only exist when the action protects a "legally-recognized property interest."  Id. at 1225-26; Def.'s Mot. to Dismiss at 6.  In Adams, the Federal Circuit found that the plaintiffs' claims for overtime pay did not meet this standard, as they "confuse[d] a property right cognizable under the Takings Clause of the Fifth Amendment with a due process right to payment of a monetary entitlement under a compensation statute."  391 F.3d at 1220.

Interestingly, the Federal Circuit in Adams cites to Cities Serv. Co. v. McGrath in finding that causes of action are property rights when they protect legally-recognized property interests.  The Federal Circuit cited this same case in Alliance of Descendants where it held that a legal cause of action is property when it protects an interest like land.  In Adams, the Court found no legally-protected interest in a claim of Government liability for overtime pay before an administrative agency.  391 F.3d at 1226.  Importantly, the nature of Government liability in Adams was created entirely by federal statute and is more aptly described as an entitlement rather than as a property right "under state and common law."  Id.  Conversely, aircraft hulls and insurance contracts are generally considered property under state and common law.  See Maritrans, 342 F.3d at 1352 (finding a property interest in tank barges); U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 19 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.").  The Government repeatedly and erroneously argues that Plaintiffs did not actually own the aircraft hull and were not attempting to enforce the insurance contracts against Libya.  Instead, the Government argues, Plaintiffs

were bringing pure tort claims which do not meet the definition of property. But the Government fails to consider the importance of the word "protect" in the operative standard here. Plaintiffs' causes of action are property rights *when they protect* legally-recognized property interests. Here, Plaintiffs' suit for damages was filed to *protect* Plaintiffs from losses sustained under their insurance contracts and the loss of the aircraft, which were caused by Libyan-sponsored terrorists. Plaintiffs need not own the aircraft or enforce the insurance contract to protect those interests with legal claims.

As holders of subrogated insurance contracts, Plaintiffs were entitled to sue and recover on behalf of the direct victims of terrorism here, and were "entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy." Subrogation, *Black's Law Dictionary* (9th ed. 2009); Pl.'s Opp. At 13-14. Thus, Plaintiffs' legal claims seeking recovery for damages to both the aircraft hull and the contract property would fall under the <u>Adams</u> definition of a claim protecting a legally-recognized property interest.

The other two cases upon which Defendant primarily relies are <u>Stauffer v. Brooks Bros. Group, Inc.</u>, 758 F.3d 1314 (Fed. Cir. 2014) and <u>Rogers v. Tristar Prods., Inc.</u>, 559 Fed. Appx. 1042 (Fed. Cir. May 2, 2012) (non-precedential). According to the Government, both cases hold that there is no vested property right in a legal cause of action until there is a final, unreviewable judgment, which Plaintiffs in this case failed to obtain. Despite the Government's characterization of <u>Rogers</u> to the contrary, neither of these cases involved a takings claim against the United States for compensation. Instead, both cases involved *qui tam* bounty hunter rights, another federal statutory entitlement, that were eliminated by statutes. Although <u>Rogers</u> discusses the Takings Clause, the action before the court was for reconsideration of a dismissal for mootness of the plaintiff's original *qui tam* whistleblower action. The plaintiff argued, among other things, that the Takings Clause prohibited the Government from extinguishing his claim, and did not argue for compensation for the *taking of the claim* itself. Thus, the court's analysis of property rights in <u>Rogers</u> is, for our purposes, inapposite. If accepted as controlling, this cursory analysis in a non-precedential opinion on the mootness of a *qui tam* action would then be inconsistent with other controlling takings analyses already summarized, which almost uniformly find that causes of action protecting legally-recognized property rights are property for Fifth Amendments purposes, regardless of their procedural posture. The Court declines to give such weight to <u>Rogers</u>. Similarly, <u>Stauffer</u> involved "an award of statutory creation, which, prior to final judgment, was wholly within the control of Congress," and thus is equally unhelpful to this Court's analysis.

The Government also cites to twelve opinions from other circuits to support its belief that "property" under the Fifth Amendment does not include non-final judgments. Only four of these opinions involve the Takings Clause as opposed to the Due Process Clause. Further, to the extent any of these cases holds that only final judgments are

considered property under the Fifth Amendment, this authority is directly contrary to the Federal Circuit precedent discussed above. Thus, the Court declines to give weight to these cases in determining what qualifies as property under the Takings Clause.

Ultimately, the Court agrees with Plaintiffs that the Federal Circuit cases discussing cognizable property under the Takings Clause are reconcilable by property type. The Adams, Rogers, and Stauffer holdings all concern claims that were brought to protect federally created statutory rights, "not state and common law recognized property interests such as land, contract, intangible property and personal injury." Pl.'s Opp. at 17. The Shanghai Power, Abrahim-Youri, and Alliance of Descendants cases all found Takings Clause property interests because the claims were brought to protect property more similar to the case at bar. Thus, for the purposes of the motion to dismiss, the Court finds that Plaintiffs have alleged sufficient facts to show a property interest in the insurance contracts they sought to protect with a legal claim against Libya, which the United States subsequently extinguished.

### 2. Taking of Property Interest

The parties' analysis of the Penn Central factors is premature at this stage of the case. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104 (1978). While those factors may ultimately be relevant in deciding whether a taking has occurred, they do not assist the Court in deciding whether Plaintiffs have stated a plausible taking claim. Plaintiffs have pled that their legal causes of action against Libya were terminated by the Claims Settlement Agreement between the United States and Libya, as well as Executive Order No. 13477. Compl. at 13. Further, although the United States provided for a settlement procedure for U.S. Nationals, "no such parallel procedure" was established for foreign nationals. Id. at 14. Thus, according to Plaintiffs, the taking occurred when the Government terminated their legal claims and then failed to provide an alternate means of recovery. These facts are sufficient to establish a claim for a taking by the United States Government for the public purpose of "'normalizing' relations between the United States and Libya." Id.

### 3. Justiciability

The Government argues that this case involves a non-justiciable political question. Def.'s Mot. at 17. Specifically, the Government claims that the "President's authority for the Claims Settlement Agreement and the extinguishment of plaintiffs' claims is beyond question and is a quintessential example of the exercise of the President's broad constitutional powers in foreign affairs." Id.; United States v. Pink, 315 U.S. 203 (1942) (Frankfurter, J., concurring). The Government also cites Shanghai Power for the proposition that "[a] judicial inquiry into whether the President could have extracted a more generous settlement from another country would seriously interfere with his ability to carry

on diplomatic relations."  4 Cl. Ct. at 248.  Yet in <u>Shanghai Power</u>, the nature of the plaintiff's suit was "to recover that difference" between the value of its claim and the settlement negotiated by the President.  <u>Id.</u> at 239.  The plaintiffs were already entitled to receive a portion of the value of their claims, but disputed the amount negotiated by the Government.  Here, however, Plaintiffs do not disagree with the amount negotiated with Libya.  Pl.'s Opp. at 39.  Instead, Plaintiffs are challenging the United States' decision to exclude them from the settlement altogether.  <u>Id.</u> at 38-39.  Plaintiffs allege the United States terminated Plaintiffs' claims, which are cognizable property rights, and then failed to include Plaintiffs in the settlement process to compensate them for said termination. Plaintiffs do not, as the Government alleges, purport to question the President's authority or discretion in his power to conduct foreign relations.  <u>Id.</u> at 37.  Instead, Plaintiffs seek compensation for their terminated claims and challenge the decisions of the Government *after* it negotiated and settled with Libya, specifically in designing the settlement process and the FCSC's jurisdiction.

Further, the Government cites <u>Belk v. United States</u> for a similar holding when the Court found it "does not believe it has the authority . . . to enter upon policy determinations for which judicially manageable standards are lacking."  12 Cl. Ct. 732, 736 (citing <u>Baker v. Carr</u>, 369 U.S. 186, 226 (1962)).  Yet, again, the facts of <u>Belk</u> involved an espousal of claims and a settlement the U.S. Government made on behalf of the plaintiffs, and of which the plaintiffs were held to be the beneficiaries.  <u>Belk</u>, 12 Cl. Ct. at 734.  Here, instead, Plaintiffs have not received any compensation or consideration for their extinguished claims, and cannot reasonably be considered to be the direct beneficiaries of the settlement with Libya.  If the Government had included them in the FCSC's jurisdiction, Plaintiffs may have been forced to accept reduced value for their claims, and any claim for a better deal would likely be non-justiciable.  But here, where Plaintiffs were excluded from receiving any just compensation whatsoever, the Court must decide whether the Government violated the Fifth Amendment prohibition of takings without just compensation.  Accordingly, the Court finds that it is well within its jurisdiction to decide this takings claim against the United States.

## Conclusion

For the foregoing reasons, the Government's motion to dismiss is DENIED. Pursuant to Rule 12(a)(4)(A), Defendant shall file its Answer within 14 days, on or before June 9, 2015.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge